JANET M. HEROLD
Regional Solicitor
SUSAN SELETSKY
Counsel for Wage and Hour
NANCY E. STEFFAN
Trial Attorney
ELIZABETH HOPKINS
Senior Trial Attorney
United States Department of Labor
Office of the Solicitor
350 S. Figueroa St., Suite 370
Los Angeles, California 90071
Direct: (213) 894-3283
Facsimile: (213) 894-2064
Email: hopkins.elizabeth@dol.gov

Attorneys for the Plaintiff

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| **R. Alexander Acosta,**<br>  Secretary of Labor,<br>  United States Department of Labor,<br><br>                Plaintiff<br><br>                v.<br><br>**G Farms, Santiago Gonzalez, Lefalco, Armando Garcia, and Raul Leon**<br><br>                Defendants. | Case No.<br><br>**DECLARATION OF KRISTINA M. ESPINOZA IN SUPPORT OF PLAINTIFF'S APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

I, KRISTINA M. ESPINOZA, declare as follows:

1. I am employed as an Investigator with the U.S. Department of Labor Wage and Hour Division ("WHD") in the Phoenix District Office. If called as a witness, I could and would testify competently to the following.

2. On May 4 and 5, 2017, as part of a WHD investigation, I visited the facilities of G Farms located at 9801 N. Litchfield Road, El Mirage, Arizona.

**DECLARATION ISO APP. FOR TRO AND PRELIM. INJUNCTION**

3. When I arrived to G Farms on May 4, I observed G Farms' employees living in a dangerous and unsanitary encampment that consisted of four yellow school buses, two semitrailers, a cargo container, and an open-air shed. G Farms housed more than 70 workers in this makeshift labor camp, which is located adjacent to the fields where the employees work harvesting onions for G Farms. The following paragraphs describe the conditions I observed on May 4 and 5, 2017.

4. Three of the school buses were used as sleeping quarters. Each of these buses housed ten workers. The workers slept on beds that were lined up end-to-end in two rows. There was less than one foot of space between the foot of one bed and the head of the next. The buses had no lockers or other areas for workers to store their personal belongings and I observed personal belongings strewn throughout the buses. The buses were dirty and I observed trash on the ground. The bus windows opened but they did not have any screens. Attached as **Exhibit A** is a photograph of the inside of one of the buses. Exhibit A is a true and correct copy of a photograph taken by a WHD Investigator as part of the inspection of G Farms on May 4, 2017 and contained in WHD's official investigative file on this matter.

5. Each of the buses had only one entrance from which employees could exit in the event of a fire. The rear exit of each of the buses was blocked by a mobile air conditioning unit, although the air conditioner in at least one of the buses blew only hot air. The one of the units was missing its covering screen, exposing employees to the motor and risk of electrocution. A photograph of the exposed air conditioner is attached as **Exhibit B**. Exhibit B is a true and correct copy of a photograph taken by a WHD Investigator as part of the inspection of G Farms on May 4, 2017 and contained in WHD's official investigative file on this matter.

6. A fourth school bus was used as a kitchen. This bus contained two gas-powered burners, one refrigerator, and a sink. The burners were fueled by three propane tanks. Two of the propane tanks were sitting on the ground outside the bus with gas lines running from the tanks into the bus through a window, creating a fire hazard. Attached as **Exhibit C** are photographs of these propane tanks. The windows and door of the kitchen bus were not screened to prevent entry of insects. The photographs in Exhibit C are true and correct copies of

**DECLARATION ISO APP. FOR TRO AND PRELIM. INJUNCTION**

photographs taken by a WHD Investigator as part of the inspection of G Farms on May 4, 2017 and contained in WHD's official investigative file on this matter.

7. The bus that housed the kitchen was stationed less than ten feet from the entrances of two of the buses where workers slept. Because the rear exits of the buses were blocked and not usable, had there been a fire in the kitchen bus, there would have been no means of egress from the two adjacent sleeping buses. The kitchen bus also had only one exit, at the front of the bus, because the rear exit was blocked by a modified kitchen sink. I did not see a fire extinguisher in the bus.

8. The buses did not meet basic fire safety requirements because there was only one means of escape from each bus, fire extinguishers were not provided or readily accessible, and propane tanks were stored adjacent to the buses where workers slept.

9. The two semitrailers were approximately 48 feet long and 103 inches wide. One of the trailers contained fourteen bunk beds (a total of 28 beds) lining the walls of the trailer. The distance between the foot of one bed and the head of the next was less than a foot. The walkway in between the beds was only approximately 4.5 feet wide. The floor of this trailer consisted of uneven aluminum rails over the bed of the trailer, which presented a tripping hazard. Attached as **Exhibit D** is a photograph of the inside of this trailer (the workers' faces have been obscured to protect their privacy). With the exception of the black circles covering the workers' faces, Exhibit D is a true and correct copy of a photograph taken by a WHD Investigator as part of the inspection of G Farms on May 4, 2017 and contained in WHD's official investigative file on this matter. The trailer had only one door, located at one end of the trailer. There were no windows in the trailer, although a small opening was cut at one end of the trailer. The opening was unscreened. Attached as **Exhibit E** is a photograph of the opening in the trailer. Exhibit E is a true and correct copy of a photograph taken by a WHD Investigator as part of the inspection of G Farms on May 4, 2017 and contained in WHD's official investigative file on this matter. The opening was not covered by a screen.

10. The second trailer contained six bunk beds (12 beds), twelve lockers, a hot plate, mini refrigerator, microwave, and a toilet. There was no wall between the kitchen area and the

**DECLARATION ISO APP. FOR TRO AND PRELIM. INJUNCTION**

beds. This trailer did not have any windows. The trailer had two doors, but one of the doors was not useable as an exit because there were no stairs leading from the door to the ground outside the trailer.

11. The two kitchen facilities were inadequate to prepare food for the 69 H-2A workers at the camp. There was not sufficient refrigerated storage space, storage shelves, or space for food preparation. Dining tables and chairs were not provided.

12. In addition to the buses and trailers, I observed that some workers slept in a nearby open-air shed on makeshift beds constructed of old school bus seats that were being stored in the shed. These appeared to be the seats that were removed from the school buses when the buses were converted to sleeping quarters. The shed was open at one end. Attached as **Exhibit F** are photographs of the bus seats in the shed that workers were using as beds. The photographs in Exhibit F are a true and correct copies of photographs taken by a WHD Investigator as part of the inspection of G Farms on May 4, 2017 and contained in WHD's official investigative file on this matter. In addition to housing the old school bus seats that workers were using as beds, the shed was used to store equipment and old cars.

13. A nearby converted cargo container contained nine shower stalls. The cargo container was elevated from the ground by small pieces of lumber and appeared to be unstable. An electrical cord used to supply power for lighting inside the shower container ran through the shower area and was exposed to standing water, creating a risk of electrocution. Attached as **Exhibit G** is a photograph of the electrical cord running through the shower area. Exhibit G is a true and correct copy of a photograph taken by a WHD Investigator as part of the inspection of G Farms on May 4, 2017 and contained in WHD's official investigative file on this matter.

14. The shower facilities were not properly connected to any sewage system. The single plastic drain pipe connected to the shower container that would have taken the waste water to the open field next to the facilities was broken. As a result, the waste water from the showers pooled under the trailer. Attached as **Exhibit H** are photographs of the broken pipe and pooled water outside the shower container. The photographs in Exhibit H are true and

correct copies of a photographs taken by a WHD Investigator as part of the inspection of G Farms on May 4, 2017 and contained in WHD's official investigative file on this matter.

15. The shower facilities were filthy and the floor was littered with trash.

16. WHD interviewed a number of workers at G Farms. According to these workers, there was no hot water provided in the showers.

17. Other than the single toilet in the trailer, the only toilet facilities available were port-a-johns located adjacent to one of the trailers.

18. During a meeting on May 5, 2017, described in greater detail below, one of G Farms' owners, Santiago Gonzalez, told WHD that G Farms currently employs 69 H-2A workers to harvest onions at G Farms. According to Mr. Gonzalez, 35 of these H-2A workers arrived on April 21, 2017 and began working on April 22, and 36 more workers arrived on April 28. According to Mr. Gonzalez, all of these workers were living at the encampment described above.

19. Prior to traveling to G Farms on May 4, 2017, I reviewed the "clearance order" (a document that is submitted to the Department of Labor in order to apply for temporary labor certification) that G Farms filed on January 31, 2017. A copy of this clearance order, which I obtained from the Department's website icert.doleta.gov on May 4, 2017 is attached as **Exhibit I**. G Farms' January 31 clearance order (Exhibit I) states that workers would be housed in "Eight (8) mobile homes barrack st[y]le with half bathroom on each dormitory, another mobil[e] unit as kitchen facilities and additional mobile unit with shower facilities." The clearance order also stated that workers would be provided with cooking facilities. The clearance order (Exhibit I) was signed by Santiago Gonzalez.

20. On or about February 18, 2017, G Farms submitted a revised clearance order. I learned this fact on May 5, 2017 when I received a copy of G Farms' revised clearance order (dated February 18, 2017) from the Arizona Department of Economic Security ("DES"), the state agency responsible for inspecting and certifying that H2-A worker housing meets the applicable standards, among other responsibilities. A copy of this revised clearance order that I received from DES is attached as **Exhibit J**. When I met with him on May 5, Mr. Gonzalez

**DECLARATION ISO APP. FOR TRO AND PRELIM. INJUNCTION**

stated that the revised clearance order (Exhibit J) was submitted after DES informed Mr. Gonzalez that the buses and trailers that he intended to use as mobile housing would not pass the inspection. A representative of the DES also informed the Department of Labor by email that the housing that G Farms proposed to use in the original clearance order did not pass the required inspection. A copy of an email between the DOL and DES is attached as **Exhibit K**.

21. In the revised clearance order (Exhibit J), G Farms stated that the employees would be housed at the Woodspring Suites Phoenix Peoria hotel in Peoria, Arizona and that 30 rooms had been reserved to accommodate the employees.

22. The revised clearance order (Exhibit J) also states that G Farms would hire a catering service to provide three meals per day to the employees and that each employee would be charged $14 per day for this food.

23. Santiago Gonzalez signed the revised clearance order (Exhibit J) on behalf of G Farms.

24. Both the original and revised clearance orders (Exhibits I and J) also state that the employees would be expected to work eight hours per day, five days per week, and would be paid an hourly wage of $10.95 per hour.

25. On May 5, 2017, I and other WHD personnel met with representatives of G Farms. Santiago Gonzalez, Gabriel Gonzales, Arturo Valdez Castro, Tony Pena, and Raul Leon were present at the meeting. During the meeting, Santiago Gonzalez explained that he and his brother Gabriel Gonzalez were owners of G Farms, that Mr. Valdez Castro was their employment recruiter, that Mr. Pena is a farm labor contractor who works with G Farms, and that Mr. Leon assists G Farms as a consultant.

26. On May 6, 2017, another WHD Investigator and I met with Santiago Gonzalez, Mr. Gonzalez's wife, and G Farms' attorney Michael R. King to continue the conference that began on May 5.

27. During the meetings on May 5 and 6, Santiago Gonzalez explained that G Farms harvests onions and potatoes, among other crops, and that the harvesting season began this year on April 21, 2017.

**DECLARATION ISO APP. FOR TRO AND PRELIM. INJUNCTION**

28. During the meetings, Mr. Gonzalez explained to me that the H-2A workers were recruited in Sinaloa, Mexico by Mr. Valdez Castro. After Mr. Valdez Castro identified the workers, he gave their names to Mr. Leon. Mr. Leon explained that he then called each of the workers, interviewed them, and arranged for them to be interviewed by the U.S. Consulate in order to obtain their H-2A visas. Mr. Gonzalez explained that he told Mr. Leon how many workers he needed and that Mr. Leon presented him with the H-2A paperwork, including the work order, which Mr. Gonzalez signed. Mr. Gonzalez and Mr. Leon further explained that at Mr. Leon's recommendation, G Farms used two additional companies, Logistics and Lefelco, to submit H-2A application paperwork, including the Form 9142A and clearance order.

29. Also during the May 5 and 6 meetings, Mr. Gonzalez stated that the H-2A workers are paid a piece rate based on the number of bags of onions they pick. The piece rate ranges between $0.13 and $0.70 per bag, depending on the task performed (there are at least four jobs performed by the H-2A workers: cutter, grader, loader, unloader, and wrapper). Mr. Gonzalez said that G Farms does not keep track of the hours that these employees work because they are paid by the bag, not the hour. According to Mr. Gonzalez, only the H-2A workers that work as wrappers are paid by the hour, at $11 per hour.

30. Mr. Gonzalez stated that prior to the initiation of the WHD investigation, the employees worked six days per week, but that they did not work on Saturday May 6 (after the WHD investigation began). Mr. Gonzalez also stated that the clippers and graders work from approximately 5:30 am until 2:00 or 3:00 pm each workday, that the loaders work a similar amount of hours per day (but begin and end their work later than the cutters and graders), and that the unloaders work from approximately 7:00 or 8:00 am until 5:00 or 6:00 pm.

31. On May 5, 2017 other WHD personnel and I informed G Farms that WHD was conducting an investigation and requested that G Farms provide various records, including records showing the days worked and hours worked each day by all employees, copies of employee paychecks and check stubs, and other records of hours worked and wages paid. A copy of the letter to G Farms requesting such records is attached as **Exhibit L**.

**DECLARATION ISO APP. FOR TRO AND PRELIM. INJUNCTION**

**Page 7 of 9**

32. On May 6, 2017, G Farms provided WHD with some payroll information. I have reviewed all of the payroll information provided by G Farms. The information provided does not show the days on which each employee worked, the number of hours worked each day, or the deductions that were taken from the employees' pay. G Farms has not provided any copies of employee paychecks or pay stubs.

33. I have reviewed the payroll information provided by G Farms. Because the G Farms does not maintain records of the number of days worked or hours worked per day by each employee, it is not possible to determine whether all of the employees are paid at or above the rate stated on the clearance order ($10.95 per hour). However, if each employee worked 45 or 50 hours per week, which is an estimate based on the hours described by Mr. Gonzalez, at least some of the employees were paid less than $10.95 per hour. The employees interviewed by WHD stated that they worked more than 50 hours per week.

34. During the May 5 and 6 meetings, Mr. Gonzalez stated that he intended to house the H-2A workers at the Woodspring Suites hotel but that on the day that the workers arrived (April 21) he was told that no rooms were available at the hotel. According to Mr. Gonzalez, he therefore decided to house the workers in the converted buses and trailers he had originally intended to use (and which G Farms identified on its original clearance order). These are the same facilities the DES representative told Mr. Gonzalez could not pass the required inspection.

35. During the May 5 meeting, Mr. Leon stated that G Farms wanted to do everything possible to have the buses and semitrailers approved as employee housing. Mr. Leon also emailed the Department of Labor on May 5 to request that the clearance order be changed to reflect the fact that the workers were sleeping at the farm (where the buses and trailers are located) and not in the hotel as described in the revised clearance order. A copy of Mr. Leon's email, which he described during the meeting on May 5 and forwarded to my supervisor Eric Murray during that meeting, is attached as **Exhibit M**.

36. Also during the May 5 meeting, both Mr. Leon and Mr. Gonzalez stated that the workers did not like living in apartments and that if WHD would not let them sleep in the buses and trailers, they would end up sleeping in the fields.

**DECLARATION ISO APP. FOR TRO AND PRELIM. INJUNCTION**

37. WHD informed Mr. Gonzalez on May 5 that it was dangerous and unacceptable to house the workers in the buses and trailers. On May 6, Mr. Gonzalez stated that the employees had been moved from the buses and trailers to two nearby hotels and that they would be transferred to the Woodspring Suites on May 7. Mr. Gonzalez stated that he had reserved rooms for the workers at the Woodspring Suites starting on May 7 for one week, and that after that he hoped to find less expensive apartment-style accommodations.

38. Based on the comments made by Mr. Gonzalez and Mr. Leon during the May 5 meeting, and Mr. Gonzalez's concerns that the hotels are too expensive, WHD is concerned that G Farms will attempt to relocate the workers to the buses and trailers if they believe they can get away with it.

39. On May 9, 2017, I received a voicemail from an employee of G Farms stating that G Farms is requiring the employees for the hotel, food, and transportation and that G Farms has threatened the employees that if they talk to the government they will not be hired again in the future. The employee stated that the workers are afraid and requested our assistance.

I declare under penalty of perjury that the above is true and correct and that this declaration was executed in Phoenix, Arizona on May 10, 2017.

*Kespinoza*
KRISTINA M. ESPINOZA

**DECLARATION ISO APP. FOR TRO AND PRELIM. INJUNCTION**